## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **MUNCK WILSON MANDALA, LLP,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | |
| ) | **CASE NO. 3:22-cv-01657** |
| **MARK D. JORDAN, SCOT FLORSHEIM,** ) | |
| **LOUANN HALL, LAURA MACZKA-** ) | |
| **JORDAN, JP-BANNER, LP, JP-BANNER** ) | **JURY TRIAL REQUESTED** |
| **GP, LLC, SOONER NATIONAL** ) | |
| **PROPERTY MANAGEMENT, LP, JP** ) | |
| **REALTY PARTNERS, LTD., and** ) | |
| **BANNER INVESTORS, LLC.** ) | |
| ) | |
| *Defendants.* ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Munck Wilson Mandala, LLP ("Plaintiff") files this Complaint against Defendants Mark D. Jordan ("Jordan"), Scot Florsheim ("Florsheim"), Louann Hall ("Hall"), Laura Maczka-Jordan ("Maczka"), JP-Banner, LP ("JP-Banner"), JP-Banner GP, LLC ("JP-Banner GP"), Sooner National Property Management, LP ("Sooner"), JP Realty Partners, Ltd. ("JP Realty"), and Banner Investors, LLC ("Banner Investors") (collectively, "Defendants") and states the following:

### I.        NATURE OF THE ACTION

1.        This action involves Defendants' ongoing scheme to defraud or otherwise enrich themselves at the expense of the Plaintiff whereby Jordan, Florsheim, Hall, and Maczka, acting in concert with entities owned and/or controlled by Jordan, systemically defrauded Plaintiff by submitting materially false documents, demands, statements, and other communications manually, electronically, and through mail to Plaintiff regarding the management and operation of a commercial office building located at 12770 Coit Road in Dallas, Texas ("Banner Place").

Plaintiff brings this action to redress and end Defendants' criminal and fraudulent practices, and to recover millions of dollars of which Plaintiff was defrauded or is otherwise owed.

2.      After investigation, the Plaintiff determined that it is not the first tenant the Defendants conspired to defraud, but the Plaintiff intends to be the last. The Defendants' pattern of activity includes but is not limited to fraudulent schemes targeting tenants, including longstanding "anchor" tenants of commercial office buildings. Upon information and belief, the fraudulent scheme is carried out as follows: through one of the entities that Jordan owns or controls, he first purchases a commercial office building and then works to convince the building tenants that as the owner of the building it is in his interest to (i) improve the newly purchased building's appearance, amenities, and security; and (ii) reduce the operating expenses of the building to increase its overall profits.  Jordan then touts his ability to greatly reduce the building's operating expenses by employing his own management company, Sooner, to manage the building at a reduced cost. The Defendants also promise substantial capital improvements to immediately upgrade the building's deficiencies.[1]   In reality, however, Jordan uses Sooner—an entity owned, operated, and controlled by him—as a vehicle of his enterprise to defraud tenants out of hundreds of thousands of dollars a year in fraudulent, fictitious, and/or inflated "operating expense" charges built into commercial leases and uses the money to benefit himself and co-conspirators.  Jordan,

---

[1]  Office buildings are generally classified into one of three categories: Class A, Class B, or Class C. Class A offices represent the newest and highest quality buildings in the market and possess high-quality building infrastructure, property management, and security. Jordan and Florsheim contracted with Plaintiff, upon purchase of Banner Place, to invest $750,000 immediately (i) in the Banner Place lobby and elevators, and (ii) to improve physical security in Banner Place and affiliated garages.

Florsheim, Hall, and Maczka are employed by and/or operate on behalf of Sooner and help Jordan to commit legally wrongful acts for his and their own personal gain.[2]

## II.      INTRODUCTION

3.      The Plaintiff is one of the nation's leading technology-focused law firms. The Plaintiff has established a substantial track record of handling complex legal matters in courtrooms and the business of its clients in boardrooms. The Plaintiff is headquartered in Dallas, Texas, and has additional offices in Austin, Houston, Waco, and Marshall, Texas; Los Angeles, California; Boca Raton, Florida and is opening an office in Orlando, Florida this year. The Plaintiff represents clients across the world. The Plaintiff prides itself on ensuring a safe and secure professional environment to protect not only the interests of its clients, but also the health and welfare of its partners and employees. The Plaintiff is proud to be recognized repeatedly as one of the "Best Workplaces" (such as by Inc. Magazine in both 2018 and 2020) due to the interest the Plaintiff takes in the wellbeing of its partners, employees, and clients. The quality of its flagship offices is uniquely important to the Plaintiff for both retaining and recruiting partners, employees, and clients.

4.      Jordan is a self-proclaimed "prominent" real estate developer in the Dallas area. Maczka is a former mayor of Richardson, Texas. Maczka and Jordan purportedly married during

---

[2]  At the time Banner Place was purchased from the prior owner, Jordan, Florsheim and Maczka knew that Jordan, Maczka, and Sooner were under criminal investigation by the United States Department of Justice for federal bribery, tax fraud, and other "public corruption"-type crimes (collectively, the "Federal Criminal Investigation"). Jordan and Florsheim failed to disclose any fact, information, or even the existence of the Federal Criminal Investigation to the Plaintiff (and presumably the prior owner) at a time when the prior owner, the Plaintiff, Jordan, and Florsheim negotiated (i) an estoppel letter given by the Plaintiff, (ii) an amendment to the master lease agreement executed by the Plaintiff, and (iii) a financial investment made by the Plaintiff in Banner Place.  Failing to disclose the existence of the Federal Criminal Investigation and pertinent facts about the same, was material and a breach of fiduciary duty as Jordan and Florsheim assumed the role of brokers and the Plaintiff was a principal to whom they owed several duties.

the Federal Criminal Investigation to create a marital privilege. Jordan and Maczka have twice been convicted of federal white-collar and public-corruption violations in the Eastern District of Texas.[3]  According to information presented in court, from May 2013 through April 2015, Jordan and Maczka (while she was the mayor of Richardson) conspired to devise and execute a scheme to commit bribery. Maczka, contrary to her mayoral campaign promises, supported and repeatedly voted for controversial zoning changes sought by Jordan, ultimately allowing for the construction of over 1,000 new apartments in Richardson near other Richardson neighborhoods. In exchange, Jordan paid Maczka over $18,000 in cash, an additional $40,000 by check, and paid for over $24,000 in renovations to Maczka's home. Jordan also paid for luxury hotel stays and airfare upgrades for Maczka and provided Maczka lucrative employment at Sooner. Upon information and belief, Maczka performed no services for Sooner. According to court testimony, Maczka and Jordan failed to disclose to the public that they had coordinated to affect the zoning changes Jordan wanted and that Jordan had provided a stream of benefits to Maczka. Maczka and Jordan were indicted by a federal grand jury on May 10, 2018 and were ultimately convicted of bribery, defrauding the United States, tax fraud, and conspiracy. Maczka and Jordan each face lengthy federal prison terms for such convictions.

5.     Jordan has also historically directed and controlled an enterprise that consists of individuals, corporations, LLCs and partnerships that directly or indirectly hold title to or manage commercial office buildings in Texas and other states (the "Sooner Enterprise"). The Sooner Enterprise includes, but it not limited to, all Defendants. Through the Sooner Enterprise,

---

[3]  Most recently, Jordan and Maczka were found guilty by a jury following a three-week trial of (i) bribery concerning a program receiving federal funds, (ii) conspiracy to commit bribery concerning a program receiving federal funds, (iii) tax fraud, and (iv) conspiracy to commit tax fraud.

Defendants defrauded and damaged Plaintiff by making misleading statements either directly, through email, or through mailed correspondence to Plaintiff regarding future capital improvements to, and management of, Banner Place; and submitting either directly, through email or through mailed correspondence false and fraudulent operating expense reports and follow up correspondence(s) to Plaintiff, which reflect expenses that are unrelated to the operation and management of Banner Place, for fictitious services that were never rendered, and/or are artificially inflated.  The fraudulent operating expense reports are intended to defraud Banner Place tenants (such as Plaintiff) out of basic rent, a portion of which is earmarked for operating expenses. Jordan, Florsheim, and later, Hall, knowingly and continuously directed and/or participated in the Sooner Enterprise's scheme to commit fraud and steal money from commercial tenants. Jordan, Florsheim, Hall, and Maczka have also individually, collectively, and intentionally committed legally wrongful acts through the Sooner Enterprise for personal gain, including but not limited to payment in the form of, at least, salary and bonuses.

6.      In the fall of 2016, during the Banner Place purchase, Jordan and Florsheim approached the Plaintiff—the longstanding anchor tenant of Banner Place—to propose a business arrangement wherein the Plaintiff would become an investor and part-owner of Banner Place with JP-Banner (an entity owned and controlled by Jordan) and would continue leasing office space therein from the new owner, JP-Banner (the majority owner of the building).  Jordan and Florsheim represented to the Plaintiff that the operating costs of Banner Place would decrease significantly once JP-Banner purchased it and employed Sooner (a company 99.9% owned by Jordan) to manage Banner Place and that certain capital improvements would promptly be made to upgrade Banner Place to a Class A property.

7.     To prove their sincerity, Jordan and Florsheim provided the Plaintiff with pitch emails, including one on November 29, 2016 (the "Investment Pitch email"). A true and correct copy of the Investment Pitch email is attached as Exhibit 1. The Investment Pitch email included a breakdown of the proposed Banner Place purchase, Sooner's nearly 4.5 million square feet of office space (including several Richardson office properties near and around the 1,000+ apartments), and the contact information for a past investor, Troy Philips, "who transacted with Mark on the Addison building he mentioned. Feel free to reach out to [Philips] directly."  Neither Florsheim nor Jordan mentioned the Federal Criminal Investigation. The Plaintiff reached out to Philips directly, and Philips endorsed Jordan and the Sooner Enterprise. Philips identified himself as a happy investor and as a name partner in Jordan's and the Sooner Enterprise's law firm. Philips also never mentioned the Federal Criminal Investigation. It is unknown at this time whether Philips or his law firm knew about the Federal Criminal Investigation at the time of his endorsement of Jordan and the Sooner Enterprise.

8.     In early spring 2017, to further prove their sincerity and secure the Plaintiff's investment in Banner Place, Florsheim introduced Plaintiff to the Sooner Enterprise's architect. The architect discussed several projects it had undertaken on behalf of Jordan and the Sooner Enterprise, met with the Plaintiff on multiple occasions, and continually endorsed Jordan, Florsheim, and the Sooner Enterprise. The architect also never mentioned the Federal Criminal Investigation. It is unknown at this time whether the architect knew about the Federal Criminal Investigation at the time of its endorsement of Jordan, Florsheim and the Sooner Enterprise.

9.     In reliance upon Jordan, Florsheim, Hall, JP-Banner, Sooner and JP Banner GP's representations, numerous third-party endorsements, and without knowledge of the Federal

Criminal Investigation, the Plaintiff invested money into JP-Banner as a limited partner.[4] After acquiring Banner Place, Jordan employed Sooner to provide property management services for Banner Place and its tenants, including the Plaintiff. This arrangement enabled Jordan and his entities to manage the operations of Banner Place thereby controlling the operational expenses of its tenants. Jordan would then direct the management company he controlled to surreptitiously reduce the services provided to Plaintiff (and other Banner Place tenants) on the one hand, provide fraudulent year-end operating reports on the other hand, and then invoice Plaintiff for additional fictitious "excess costs." By controlling both Plaintiff's "expense account" and the management of the building, Jordan and his various entities were able to steal a portion of Plaintiff's basic rent earmarked for operating expenses. In addition to the Sooner Enterprise's scheme to defraud Banner Place tenants out of rent, the severe reduction of services and failure to improve the building were among many material breaches of the Plaintiff's lease. On information and belief, the monies and unjust enrichment resulting from the Sooner Enterprise's scheme to defraud Plaintiff have been and continue to be funneled into various entities owned and/or controlled, directly or indirectly, by Jordan (and, thus, into Jordan's pockets) and/or his fellow conspirators—instead of going to the Plaintiff (and other tenants or investors).

### III.      PARTIES

10.      Munck Wilson Mandala, LLP is a Texas limited liability partnership with its principal place of business in Dallas, Texas. The Plaintiff's main offices are located at Banner Place. Although Plaintiff also maintains offices in Austin, Houston, Waco, and Marshall, Texas;

---

[4] Plaintiff recites the facts regarding its investment solely to show the Court the Sooner Enterprise's *modus operandi*. Plaintiff is not asserting any causes of action based upon its investment.

Los Angeles, California; and Boca Raton, Florida, its Banner Place office is its flagship location and its largest.

11.     JP-Banner, LP is a Texas limited partnership with its principal place of business in Dallas, Texas. JP-Banner may be served through its registered agent, Mark D. Jordan, at 12770 Coit Road, Suite 1050, Dallas, Texas 75251. Banner Place is owned by JP-Banner and managed by Sooner (both of which are owned and/or controlled by Jordan).

12.     JP-Banner GP, LLC is a Texas limited liability company with its principal place of business in Richardson, Texas. JP-Banner GP is the general partner of JP-Banner. JP-Banner GP is owned by J&P Realty Services, Inc., which is owned and/or controlled by Jordan, who is its President and Manager. JP-Banner GP may be served through its registered agent, Mark D. Jordan, at 12770 Coit Road, Suite 1050, Dallas, Texas 75251.

13.     J&P Realty Partners, Ltd. is a Texas limited partnership, with its principal place of business in Dallas, Texas. Jordan is the Manager of JP Realty. According to JP Realty's 2019 Texas Franchise Tax Report (which was executed by Jordan), Trevmar LLC is the general partner of JP Realty. Jordan is the sole member and 100% owner of Trevmar LLC. JP Realty may be served through its registered agent, Mark D. Jordan, at 12770 Coit Road, Suite 1050, Dallas, Texas 75251.

14.     Sooner National Property Management, LP is a Texas limited partnership, with its principal place of business in Dallas, Texas. Jordan owns 99.9% of Sooner as follows: (a) Jordan is the sole member and 100% owner of Trevmar LLC; (b) according to the JP Realty's 2019 Texas Franchise Tax Report (which was executed by Jordan), Trevmar LLC is the general partner of JP Realty; and (c) JP Realty owns 99.9% of Sooner. On its website, Sooner includes a disclaimer that "Sooner National Property Management leasing is handled by its affiliate J&P Realty Services,

Inc." *See* Jordan bio, attached as Exhibit 2 (previously located at http://soonermanagement.com/mark-jordan/.). Sooner may be served through its registered agent, Mark D. Jordan, at 2435 N. Central Expressway, Suite 1650, Richardson, TX 75080.

15.     Banner Investors, LLC is a Texas limited liability company with its principal place of business in Dallas, Texas. Jordan is the manager of Banner Investors. Banner Investors may be served through its registered agent, Mark D. Jordan, at 12770 Coit Road, Suite 1050, Dallas, Texas 75251.

16.     Mark D. Jordan is an individual residing at 6609 Shady Creek Circle, Plano, Texas 75024. Jordan regularly conducts business in Dallas County, Texas, including at the offices of JP-Banner, JP-Banner GP, and Sooner, all of which are located at 12770 Coit Road, Dallas, Texas 75251. Jordan owns and/or controls, along with other entities, JP-Banner, JP-Banner GP, Sooner, JP Realty, and Banner Investors, and uses them to effectuate his fraudulent schemes. According to his public biography, Jordan is a "co-founder of Sooner Management and the Managing Member of JP Realty Partners, Ltd., a leading full service commercial real estate management firm." *See* Exhibit 2.

17.     Scot Florsheim is an individual residing at 6313 Westchester Lane, in Plano, Texas. Florsheim regularly conducts business in Dallas County, including at the offices of Sooner, which is located at 12770 Coit Road, Dallas, Texas 75251. Florsheim "joined Sooner Management and JP Realty Partners as a partner in 2015" and is "responsible for the oversight and performance of JP Realty Partner's real estate and investment portfolio, including development, acquisitions, and dispositions." *See* Florsheim bio, attached as Exhibit 3 (previously located at http://soonermanagement.com/scot-florsheim/.).

18.     Louann Hall is an individual residing at 5102 Crawfish Lane, Garland, Texas 75043. Hall regularly conducts business in Dallas County, including at the offices of Sooner, which is located at 12770 Coit Road, Dallas, Texas 75251. Hall is a Regional Director of Sooner. *See* Hall bio, attached as Exhibit 4 (previously located at http://soonermanagement.com/louann-hall/).

19.     Laura Maczka-Jordan is an individual residing at 6609 Shady Creek Circle, Plano, Texas 75024. Maczka regularly conducts business in Dallas County, Texas, including at the offices of JP-Banner, JP-Banner GP, and Sooner, all of which are located at 12770 Coit Road, Dallas, Texas 75251. According to Sooner Management's website, Maczka is responsible for HR, Communications and Administration. *See* Sooner Management, Our People, attached as Exhibit 5 (previously located at http://soonermanagement.com/about/ourpeople/).

## IV.     JURISDICTION & VENUE

20.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961, *et seq.*, because they arise under the laws of the United States of America. Additionally, pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the state law claims because they are so related to the RICO claims as to form a part of the same case and controversy.

21.     Pursuant to 28 U.S.C. 1391(b), venue is proper in the district because a substantial part of the events or omissions giving rise to the claim occurred in the judicial district located in Dallas County, Texas, and/or all Defendants are residents of the state of Texas and at least one Defendant resides in this district.

## V.     FACTUAL BACKGROUND

### A.     Plaintiff Enters a lease for its main Dallas offices.

22.     The Plaintiff's main offices have been located at Banner Place on 12770 Coit Road in Dallas, Texas since 2007. Specifically, on May 30, 2007, the Plaintiff's predecessor (Munck

Butrus, P.C.) and Gaedeke Holdings II, Ltd. ("Gaedeke") entered into a lease (as later amended, the "Lease Agreement" or "Lease") for office space in Banner Place. A true and correct copy of the Lease Agreement and amendments are attached hereto as Exhibit 6. The Lease was originally set to expire on June 30, 2020, but provided the Plaintiff the option to terminate in mid-2014 upon payment of an early-termination fee. This early-termination option was a material term to the Plaintiff in the Lease Agreement.

23.     The monthly rental amount under the Lease includes both a fixed cost and variable costs for operating expenses, which are estimated based on costs for a "base year." When JP-Banner took over ownership of Banner Place in mid-2017, JP-Banner would issue invoices to Plaintiff. Some of the invoices and other communications related thereto were sent via United States mail and by email.

24.     The operating expense portion of the monthly rent is earmarked in the Lease for specific enumerated operating expenses and not for use by the Sooner Enterprise for personal gain. The operating expenses are to be reconciled at year end with the balance to be credited to Plaintiff. As landlord, JP-Banner is responsible for issuing annual operating expense reconciliation reports to Plaintiff, which compare the estimated charges for operating expenses to those actually incurred for the year in question. JP-Banner uses Sooner to issue these reports. JP-Banner has not issued required reports for the years of 2020 and 2021.

25.     If the estimated annual operating expenses are less than the actual operating expenses for the year in question, the Lease requires JP-Banner to issue a credit to Plaintiff for the difference. On the other hand, if the actual operating expenses for the year in question exceed the estimated operating expenses, Plaintiff is required to pay the difference in costs.

26.     Munck Butrus, P.C. changed its name to Munck Carter, P.C. On July 23, 2009, the firm and Gaedeke executed a Second Amendment to the Lease that changed the name of the tenant to Munck Carter, P.C. ("Second Amendment"). A Third Amendment to the Lease was executed December 9, 2009. On May 27, 2010, Munck Carter, P.C. and another Plaintiff predecessor (Munck Carter, LLP) executed a Fourth Amendment to the Lease, which, among other things extended the lease term into 2025 and the early termination option to late 2018 ("Fourth Amendment"). A Fifth Amendment to the Lease was executed June 14, 2016.

27.     Gaedeke listed Banner Place for sale in fall 2016. It is unknown when Jordan began discussions with Gaedeke, however, Jordan and Florsheim made contact with the Plaintiff several weeks after the listing.

28.     In early 2017, JP-Banner purchased Banner Place from Gaedeke. On February 21, 2017, the parties executed a Sixth Amendment to the Lease that transferred landlord and property management service responsibilities from Gaedeke to JP-Banner ("Sixth Amendment"). As detailed below, Defendants have a pattern of acquiring commercial buildings and defrauding current tenants by submitting fraudulent charges through a series of entities owned and operated by Defendants with the goal of defrauding tenants out of the operational costs portion of their monthly rent. The acquisition of Banner Place and simultaneous misrepresentations to Plaintiff regarding capital improvements and operational costs was part of Defendants' well practiced *modus operandi.*

**B.     Jordan's *modus operandi.***

29.     In 2019, a group of investors brought an action against Jordan, Sooner, and other affiliated entities, styled *JP Bent Tree, LP, et al., v. JP Bent Tree GP, LLC, et al.*, Case No. DC-

19-07168 (Dallas County) (2019).[5] A true and correct copy of the *JP Bent Tree* Complaint is attached as Exhibit 7. The complaint alleged, among other things:

> This is an action to hold Mark Jordan and his affiliated companies liable for their misconduct stated below. For years, Mark Jordan, through the former General Partners he controlled, *cheated* the Limited Partners out of substantial amounts due to them and allowed Mr. Jordan's affiliated company, Sooner, to bilk the Partnerships through excessive and improper charges—all for Mr. Jordan's own financial gain.

*See* Exhibit 7, Plaintiff's Original Petition at 1, *JP Bent Tree LP, et al. v. JP Bent Tree GP, LLC, et al.,* Case No. DC-19-07168 (Dallas County) (2019).

30. The plaintiffs in *JP Bent Tree* alleged that the *JP Bent Tree* Defendants used Jordan's network of entities to defraud tenants and bilk investors out of money under the guise of building operation and management fees:

> a) Sooner was entitled to a fee and reimbursement from the Partnerships for employees dedicated to Partnership Properties (*e.g.*, building engineers). When Mr. Jordan controlled the former General Partners and Sooner was the property manager, these salaries increased dramatically—*i.e.*, by almost 175%. Although styled as "reimbursements," there is reason to believe that the "reimbursement" amounts far exceed the employees' salaries and that Defendants "pocketed" the rest.
>
> b) Through yet another affiliated entity, Mr. Jordan was wrongfully receiving "kickbacks" from utility brokers on certain utility expenses charged through to the Limited Partners.
>
> c) Mr. Jordan—when controlling the former General Partners—also attempted to pass through other unpermitted reimbursements and excessive overhead to the Limited Partners, such as his own life insurance, a computer for his wife, software licenses, stationary, and the cost of Sooner's computer servers.

*See* Exhibit 7.

---

[5] In the *JP Bent Tree* and *Romack* litigation, Jordan delayed litigation of the merits of the lawsuit by more than two years by filing frivolous anti-SLAPP motion(s) and appealing the denial. Plaintiff anticipates the Sooner Enterprise will engage in dilatory tactics to avoid reaching the merits of this litigation as well.

31.     Jordan's practice of using his affiliated entities to effectuate fraudulent conduct was also alleged in *Regions Bank v. JP-Realty Partners, Ltd. et al*., Case No. 11-0791-III (Chancery Court of Tennessee, Davidson County) (2011). A true and correct copy of the Plaintiff's Amended Complaint is attached as Exhibit 8. The plaintiff in *Regions Bank* claimed, among other things, that Jordan used his entities to attempt to shield himself from liability on payment of a $360,000 debt. And, under the heading "It's All Really Mark Jordan," the plaintiff alleged that:

   a)  All of the parties other than Regions Bank involved in the transactions at issue in the case were formed at the behest of and are completely controlled, directly or indirectly, by Mark Jordan ("Jordan").

   b)  JP Realty does not have any officers, managers, directors, or employees. JP Realty acts through its general partner, Trevmar LLC ("Trevmar"). Jordan is the sole member and 100% owner of Trevmar, as well as its President.

   c)  JP Realty is composed of Trevmar and the Jordan 2004 Family Trust ("Jordan Trust"). In addition to owning Trevmar, Jordan is the trustee for the Jordan Trust.

   d)  Directly or indirectly, Jordan owns and controls 100% of JP Realty.

*See* Exhibit 8, Plaintiff's Amended Complaint, *Regions Bank v. JP-Realty Partners, Ltd., et al.,* Case No. 11-791-III (Chancery Court for Davidson County, Tennessee) (2011).

32.     In 2018, the Plaintiff discovered that the United States Department of Justice investigated Jordan and Maczka in connection with a fraud and bribery scheme that Jordan and Maczka perpetuated using Jordan's network of entities – the Federal Criminal Investigation. Specifically, Jordan and Maczka were indicted by a federal grand jury on May 10, 2018 for, among other things:  (i) conspiracy to commit honest services wire fraud in violation of 18 U.S.C. § 1349; (ii) honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346; (iii) conspiracy to commit bribery concerning a program receiving federal funds in violation of 18 U.S.C. § 371; and (iv) bribery concerning a program receiving federal funds in violation of 18 U.S.C. §§ 666(a)(1)(B), 666(a)(2).  *United States v. Mark Jordan, et al.*, Case No. 4:18-cr-00087-AKM-CAN (E.D. Tex.

May 10, 2018), Dkt. No. 1 (attached as Exhibit 9). Jordan and Maczka were found guilty of nearly all counts in the indictment.[6]

33.     The indictment reflects Jordan's *modus operandi* of using his fraudulent web of entities (including Sooner) to commit illegal acts, cover his tracks, and use ill-gotten gains to fulfill his own personal ends:

> a)  On or about February 9, 2015, Jordan issued a check drawn on a Sooner National Property Management, LP checking account to the Company in the amount of $24,030.02 for payment for renovations completed at Maczka's [the prior Mayor of the City of Richardson] home. *Id.* at Dkt. No. 1 ¶ 20(xx).
>
> b)  On or about March 2, 2015, Jordan offered Maczka employment at Jordan's business, Sooner National Property Management, LP, as a leasing agent. Jordan chose to replace the departing Employee – a leasing agent who was licensed by the State of Texas Real Estate Commission and whose annual salary was approximately $70,000 – with Maczka who was not licensed and had no experience or education relevant to leasing commercial property. Jordan offered Maczka an annual salary of $150,000, a signing bonus of $15,000, and discretionary and year-end bonuses." *Id.* at ¶ 20(aaa).
>
> c)  On or about July 7, 2015, Jordan, in an attempt to conceal the true nature of the corrupt relationship between Jordan and Maczka, knowingly executed under oath the "Answers to Respondent's Written Interrogatories to Petitioner" that falsely reflected he had neither offered nor gave Maczka any "gifts, transfers of funds, or money in excess of $250 since January 1, 2010," when in fact Jordan knew that he had given and offered Maczka such things of value since January 1, 2010. Additionally with the intent to conceal the true nature of the corrupt relationship, Jordan knowingly under oath caused the "Answers to Respondent's Written Interrogatories to Petitioner" to falsely reflect that Jordan did not engage in "intimate sexual contact" with Maczka until "July 2014," when in fact Jordan knew that he had engaged in intimate sexual contact with Maczka as early as in or about January 2014. *Id.* at ¶ 20(mmm).
>
> d)  On or about July 7, 2015, Jordan caused the fraudulent "Answers to Respondent's Written Interrogatories to Petitioner" to be filed in Denton

---

[6] Jordan and Maczka's sentencing is currently set for August 4, 2022.

County District Court, located in the Eastern District of Texas. *Id.* at ¶ 20(nnn).

e) On or about July 20, 2016, Jordan, on behalf of Sooner National Property Management, LP and in an attempt to conceal the true nature of the corrupt relationship between Jordan and Maczka, caused [his accountant], to file a fraudulent 2015 U.S. Return of Partnership Income, Form 1065 (the "2015 Tax Return"). Jordan caused [his accountant] to depreciate and claim the $24,030.02 expense to renovate Maczka's residence as a business deduction in the approximate amount of $14,000 concerning the Company's fraudulent invoice, number 131-132, in the 2015 Tax Return. *Id.* at ¶ 20(ooo)

*See* Exhibit 9, *United States v. Mark Jordan, et al.*, Case No. 4:18-cr-00087-AKM-CAN (E.D. Tex. May 10, 2018), Dkt. No. 1.

34.     As revealed through the above-described litigation matters and conduct here, Jordan's *modus operandi* consists of three essential steps. ***First***: Purchase a commercial property through an entity which Jordan controls and which others invest. ***Second***: Control the management of the property through another entity Jordan owns and controls thereby giving Jordon control of the operating costs of the property. ***Third***: Overcharge the tenants (and investors) for bogus and fictitious operating expenses while simultaneously cutting corners and providing substandard security, engineering, and management services. Once this objective has been achieved, Jordan siphons the profits of his scheme to his affiliated entities for his own personal gain, rather than distributing them to investors or properly crediting the tenants. In other words, the Sooner Enterprise is set up to bilk commercial tenants (such as Plaintiff) of operational costs built into their monthly rental payment and/or present fraudulent invoices for excessive costs which are improper and/or never incurred.

### 1)     Step One – purchase a property in which others invest

35.     On information and belief, during the second half of 2016, Jordan and Florsheim— a Jordan cohort and an officer/manager of Sooner, JP-Banner, and JP Realty—met with Gaedeke to discuss the potential purchase of Banner Place.

36.     With Plaintiff unknowingly in tow, step one of Jordan's scheme was beginning to take shape.

37.     On October 31, 2016, Jordan formed JP-Banner and JP-Banner GP (the general partner of JP-Banner). Jordan appointed himself manager of JP-Banner's class B limited partner, and JP-Banner's class C limited partner. Jordan is also the 100% owner of JP-Banner GP, which he owns through another entity, J&P Realty Services, Inc.[7]

38.     Jordan's entities, including JP-Banner, JP-Banner GP, Sooner, JP Realty, and Banner Investors, are the alter egos of Jordan, are controlled, directly or indirectly, by Jordan, and were formed for the purpose of perpetrating fraud, to funnel ill-gotten gains into Jordan's personal coffers, and to cover Jordan's tracks and shield him from personal liability. At all relevant times, Jordan's entities were not only influenced and governed by Jordan, but there was such a unity of interest and ownership that the individuality or separateness of Jordan and his entities ceased to exist, and the adherence to the fiction of the separate existence of these entities would, under the particular circumstances, sanction a fraud or promote injustice.

39.     In November 2016, Jordan and Florsheim approached Plaintiff to ensure Plaintiff would remain the anchor tenant despite Jordan's planned purchase of Banner Place. Jordan and Florsheim represented that upon the purchase of Banner Place, JP-Banner would upgrade and convert it to "Class A" office space and engage a top-shelf property management company that would improve security, engineering, and management services, while simultaneously lowering operating costs.

---

[7] A 2018 Tax Franchise Report for JP-Banner GP (executed by Jordan), lists Jordan as the manager of JP-Banner GP and further lists J&P Realty Services, Inc. as the 100% owner of JP-Banner GP. A 2018 Tax Franchise Report for J&P Realty Services, Inc. (executed by Jordan) lists Jordan as President.

40.     In January 2017, Jordan and Florsheim met in person with Plaintiff's management, and again represented that upon the purchase of Banner Place, JP-Banner would promptly upgrade and make it a Class A space and obtain a top-shelf property management company that would improve security, engineering, and management services at a lower cost than before. They also reiterated that under JP-Banner's ownership and operations, Banner Place operating costs would go down. They did not disclose that Jordan, Maczka, and Jordan's entities were under the Federal Criminal Investigation in the Eastern District of Texas. Jordan, Florsheim and Jordan's cohorts intentionally and fraudulently concealed from Plaintiff the fact that Jordan, Maczka, and Sooner were being investigated for federal conspiracy charges, wire fraud, and bribery at or around this time. Indeed, Jordan and Maczka were eventually indicted for a variety of dishonest and nefarious acts that dove-tail with his *modus operandi* perpetrated on Plaintiff.

41.     In March 2017, Jordan had obtained additional investors to assist in the acquisition of Banner Place and it was acquired. Step one of his *modus operandi* was now complete. Jordan owned Banner Place.

**2)     Step Two – control the building's landlord and property management company**

42.     Step two of Jordan's *modus operandi* is to gain full control of the building's property management services to bilk tenants through false and fraudulent cost and expense statements which reflect expenses that never occurred or were deliberately inflated. Jordan hired his property management company, Sooner, to manage the building and achieve this objective.[8] By hiring his own management company (Sooner), Jordan now controls the operating expenses.

---

[8] As stated in ¶33, the United States Department of Justice has alleged that Jordan through Sooner, offered Maczka "employment" as a leasing agent, despite her not being licensed and having no relevant education or experience. Although Maczka was not listed on a list of salaried employees for Sooner, on information and belief, she remains employed with Sooner.

He then directs the management company to severely reduce operating costs. Despite severely reducing operational costs, he nonetheless directs the management company to issue fraudulent year-end operating reports that inflate costs, improperly assess costs in violation of the Lease, and/or simply create fictitious operating costs. Jordan then syphons the improper operational costs to pay for his other "business ventures" or for his personal use.

43.    Upon information and belief, Jordan "employs" Sooner to manage other commercial properties implementing the same pattern of activity of defrauding tenants through false and fraudulent costs and expenses.

44.    With steps one and two of his *modus operandi* in place, Jordan could now capitalize on his scheme.

### 3)    Step Three – Overcharge tenants for expenses while simultaneously cutting corners and funneling profits to Jordan

45.    As a *de facto* landlord and property manager, Jordan now controlled the "checks and balances" of Banner Place. This enabled him to operate with impunity, and he began to generate fraudulent building expenses and charge them to Plaintiff and other tenants, while simultaneously cutting corners in building renovations and security, engineering, and management services. Having control also allowed Jordan to surreptitiously funnel profits and monies, which rightfully belonged to Banner Place tenants and investors, to himself and his entities.

46.    Plaintiff immediately began to notice a drastic deterioration of the building's services including, among other things, security and janitorial services. For example:

- The building and garage went from having eight functional elevators to three to five working elevators. This practice has continued to the present date.

- In mid-June of 2017, the SUV of one of Plaintiff's employee was backed into a third-floor parking spot (where it could not be seen from the street). The lock was then broken, triggering an alarm. Thieves worked together to climb inside the SUV, remove the third row and then pass it out the same

rear window. Upon investigation, the police said that the SUV was targeted by someone who either knew where the vehicle was parked and had access to the "secured" garage. A security guard was thought to be involved, and when questioned, took a "smoke break" and fled the scene. The security guard did not return.

- On or about March 8, 2018, the tailgate of one of Plaintiff's partner's truck was stolen while the truck was parked inside the building's purportedly secure parking garage. On July 29, 2020, around 12:00 pm, the tailgate of that same partner's truck was stolen again while the truck was parked inside the building's parking garage. In this second instance, two men entered the building through a broken security gate and proceeded to steal the tailgate while on security cameras.

- In 2018, it was discovered that the janitorial company hired by Sooner permitted underage individuals to work nightshift hours "off the books". One middle schooler engaged in petty thefts of various items of personal property located in the premises for a number of months. Ultimately, in the summer of 2019, the young man was caught and he confessed to selling the stolen items to his schoolmates and he was being paid very little as an underage janitor. In response, Sooner terminated the janitorial services for these and other reasons – presumably for getting caught. More than $10,000 in personal items were stolen.

- In October 2019, another Plaintiff employee was approached by three women who worked elsewhere in the building. Those women reported being harassed in the parking garage by individuals who were not tenants.

- Also in October 2019, after a third Plaintiff employee entered through the security gate and into the building's purportedly secure parking garage at approximately 6 a.m., an unidentified individual breached security and entered the garage complex. The unidentified individual approached the employee's car with a bungee cord when the employee, who felt threatened, began to shout at the unidentified individual. The unidentified perpetrator fled the scene.

- In November 2019, a fourth Plaintiff employee asked the security guard to escort her to her car. Having a security guard available to escort tenants to their cars has been a building policy since Plaintiff became a tenant. The security guard declined the employee's request for fear that whoever was in the garage would come after the security guard.

- Also in November 2019, a fifth Plaintiff employee noticed that a male member of the cleaning staff was inside a closet in Plaintiff's accounting offices, which was closed and should not have been opened or accessed by the cleaning staff. The employee told the member of the cleaning staff that he was not allowed to be in that closet. Later that day, the same employee

20

of Plaintiff found the same cleaning staff member inside another locked closet in Plaintiff's accounting offices, which should not have been accessed by the cleaning staff.

- Also in November 2019, a sixth Plaintiff employee left the office at approximately 8:00 p.m. Upon leaving, that employee noticed that the front doors to the building were open and unlocked, and that there was no security present.

- Although paragraph 7(i) of the Lease requires the Landlord to provide a "Courtesy Guard" in the main lobby of the building from 7:00 a.m. through 11:00 p.m. on business days, from 8:00 a.m. through 2:00 p.m. on Saturdays, and from 8:00 a.m. through 3:00 p.m. on Sundays, on numerous occasions and at various times—including after the New Year—no guard has been present in the main lobby during these hours.  Exhibit 6, at ¶ 7(i).

- On or about June 14, 2022 at approximately 2:30PM, an Plaintiff's employee's 2018 GMC Sierra 1500 Crew Cab truck was stolen from the purportedly safe garage. For weeks prior to the incident, the security gate was inoperable. Security footage shows the thieves entering through and exiting from the inoperable gate. Plaintiff (and other tenants) notified Sooner about the inoperable gate which Sooner refused to promptly address.

47.    In the meantime, Jordan and his accomplices (including JP-Banner, JP-Banner GP, and Sooner) failed to upgrade the building to reflect Class A space; did not make improvements to the building as required under the Sixth Amendment; repeatedly proposed cheap and unacceptable options for artwork, elevator cab finishes, and stairway improvements; and provided inadequate janitorial and security services for Banner Place.

48.    During this austerity period, Jordan, Florsheim, Maczka and Sooner built out lavish office space on the tenth floor of Banner Place under the guise of creating office space for management, rather than using existing available space on the second floor that was previously used by the former landlord's management. Jordan used this space to operate his other operations rent-free, including but not limited to his "Cowboy Chicken" franchises, which he surreptitiously operated from Banner Place without notifying Plaintiff and other investors. Jordan, Maczka, and Sooner also used these offices as "war rooms" for meeting and working with their criminal defense

21

attorneys in defending themselves from the Federal Criminal Investigation, two federal trials, and subsequent convictions.

49.     On information and belief and based on the rapidly declining condition of the building and common areas, rather than providing $750,000 in upgrades on Banner Place pursuant to the Sixth Amendment, Defendants surreptitiously and fraudulently commingled these funds with accounts for other buildings managed by Sooner and/or Jordan's other affiliated entities.

## C.     Defendants bilk money from Plaintiff by disguising bogus charges as legitimate operating expenses.

50.     Once ownership and management of Banner Place transitioned to JP-Banner and Sooner (and in turn, Jordan), Defendants began to bilk Plaintiff out of money by disguising bogus costs as legitimate operating expenses under the Lease. On information and belief, the same occurred with other tenants of Banner Place.

51.     Plaintiff's monthly rental amount is calculated, in part, by determining whether basic costs for a calendar year exceed basic costs for a base year. *See* Exhibit 6, at ¶¶ 1(a)-(k). Plaintiff pays its monthly rent through wires and checks. On information and belief, the wires are sent to, and the checks are deposited in, a financial institution which operates in interstate commerce.

52.     Plaintiff's monthly payment to JP-Banner includes, in-part, the basic costs. These costs are reflected on annual operating expense reports JP-Banner, alone and/or through Sooner, sent to Plaintiff. Documents including but not limited to rental invoices, the operating reports, and related communications regarding Sooner's management of the building and fraudulent operating costs were sent, in part, through the mail. Throughout the history of the Lease term with Gaedeke, Plaintiff consistently received credit payments reflecting operating costs for Banner Place that were ***lower*** than the basic costs for the attributable base year.

53.     When Sooner began to manage Banner Place, however, the operating cost credits began to decrease dramatically, and JP-Banner began to charge Plaintiff for "Excess Basic Costs" on operating expense reports for the first time in the history of Plaintiff's Lease at Banner Place.

54.     In other words, despite the deteriorating services being provided after JP-Banner purchased and Sooner took over property management for Banner Place, Plaintiff went from being annually credited upwards of $100,000 under the Lease, to being credited approximately $25,000 in 2017, and then ***being charged*** in 2018 and 2019.[9]

| Year | Credit/(Charge) |
|------|-----------------|
| 2012 | $96,484 |
| 2013 | $155,429 |
| 2014 | $126,663 |
| 2015 | $111,399 |
| 2016 | $144,067 |
| 2017 | **Sooner takes over March 2017** $25,525 |
| 2018 | ($16,430) |
| 2019[10] | ($2,465.59) |

---

[9] Plaintiff has not received required operating expense reports for 2020 and 2021.

[10] Incredibly, the original 2019 OPEX Report credited Plaintiff for $44,042. After Plaintiff provided JP-Banner with an audit which (once again) showed JP-Banner had fraudulently overstated and/or created improper and fictitious operating expenses in the amount of $60,559, JP-Banner reassessed the 2019 operating expenses zeroing out the original credit and invoicing Plaintiff for $2,465.59 for excessive costs.

55.    Plaintiff received a letter from Sooner on May 23, 2019, that included, *inter alia*, a revised 2017 Operating Expense Reconciliation Report ("2017 OPEX Report") and a 2018 Operating Expense Reconciliation Report ("2018 OPEX Report"). A true and correct copy of the 2017 OPEX Report is attached as Exhibit 10. A true and correct copy of the 2018 OPEX Report is attached as Exhibit 11. In 2020, Plaintiff received a letter from Sooner through the mail that included the 2019 Operating Expense Reconciliation Report ("2019 OPEX Report"). A true and correct copy of the 2019 OPEX Report is attached as Exhibit 12. All of the OPEX Reports contained false and fraudulent misrepresentations regarding Banner Place's operation and managing expenses, as the Sooner Enterprise and Jordan's *modus operandi* are detailed below.

### 1)    Fraudulent Expenses Related to Building Occupancy

56.    The Lease gives the landlord the right to "gross-up" all basic costs that "***vary with occupancy*** as if the Building has been 95% occupied and . . . services had been provided to the entire Building during that calendar year[.]" *See* Exhibit 6, at ¶ 1(k) (emphasis added). This enables the landlord to increase variable components of costs, provided that such components vary ***directly*** with the tenant level of occupancy.

57.    JP-Banner and Sooner, however, used this provision of the lease to fraudulently "gross up" several categories of expenses that were not—and could not be—impacted by occupancy of the building. These categories largely entailed repairs and maintenance of common areas, which are not impacted by occupancy and therefore cannot be grossed up. *See* Exhibit 6. For example, JP-Banner and Sooner grossed-up $92,204.14 in charges on the 2017 OPEX Report and $115,340.95 in charges on the 2018 OPEX Report for expenses that did not vary with

occupancy.[11]  *See* Exhibits 10 (Revised 2017 OPEX Report) and 11 (2018 OPEX Report). At the time of issuance, JP-Banner, Sooner, and Jordan knew these reports included charges for expenses which could not be grossed up but used the numbers to defraud Plaintiff (and presumably other tenants) out of its excess operational expense payments.

### 2)    Fictitious Occupancy Percentages

58.    JP-Banner and/or Sooner also manipulated the square footage in order to determine occupancy percentages of the building. Specifically, the Lease stipulates a rental area of 280,432 square feet for the purpose of determining occupancy percentages. *See* Exhibit 6, at ¶ 1(d) ("Landlord and tenant stipulate that the Rentable Area of the Building is 280,432 square feet regardless of whether this stipulated number is more or less than the actual number of square feet.").

59.    The 2017 and 2018 OPEX Reports, however, fraudulently grossed up expenses using 285,111 square feet as the basis for determining occupancy percentages. *See* Exhibit 10, pg. 4 and Exhibit 11, pg. 4. This enabled JP-Banner and Sooner to artificially inflate the grossed-up calculations by over 5,000 square feet and charge Plaintiff for phantom operating expenses for square footage that did not exist.

---

[11]   These categories included $5,479.57 for plumbing repairs and maintenance, $26,554.85 for HVAC repairs, $25,819.51 for elevator repairs, $12,249.87 for electrical expenses, $317.81 for supplies and tools, $13.89 for locks and keys, $19,318.36 for general building maintenance, and $2,450.27 for trash disposal on the 2017 OPEX Report; and $52,947.52 for HVAC repairs, $1,417.46 for elevator repairs, $10,282.39 for lighting, $9,968.85 for electrical expenses, $1,316.76 for supplies and tools, $376.71 for locks and keys, $24,291.85 for general building maintenance, and $3,889.82 for trash disposal on the 2018 OPEX Report.  None of these categories, with the exception of trash removal, have ever been grossed up in any other previous OPEX report in the history of the Lease. *See* Exhibit 6, at ¶ 1(k) ("Landlord shall categorize a particular expense as being included or excludable from Basic Costs in accordance with the requirements of this lease and ***consistent with Landlord's characterization of that expense in determining or projecting Basic Costs in prior calendar years***.") (emphasis added).

60.     Indeed, an independent auditor of the 2017 and 2018 OPEX stated as follows: "[o]ur audit uncovered numerous errors and inappropriate charges, **in fact, we have never before seen this level of erroneous and inappropriate charges in an audit of operating expense reconciliations.**" Attached hereto as Exhibit 13 is a true and correct copy of the Audit of 2018 and 2017 Basic Costs and OPEX and Electric Reconciliations. Attached hereto as Exhibit 14 is a true and correct copy of the Lease Operating Expense Audit Report – Calendar Year 2019.

### 3)     Inflated and/or Fictitious Management Fees

61.     The Lease permits the landlord to pass the costs of building management fees to the tenant as building costs in certain circumstances. Section 1(c)(15) of the Lease provides that: "[c]osts . . . paid by Landlord to any subsidiary or affiliate of Landlord for goods or services," are excluded as operating expenses "to the extent the same exceed the costs and the overhead and profit increment of such goods or services rendered by *qualified, first-class unaffiliated third parties on a competitive basis*." *See* Exhibit 6, at ¶ 1(c)(15) (emphasis added).

62.     After receiving the 2017 and 2018 OPEX Reports, Plaintiff discovered that Sooner's "management fee" was a staggering 5% of revenues—far more than the market rate in Dallas for management fees by a third party of comparable buildings (1.75% to 2.5% of revenues). *See* Exhibit 10 at pg. 4 and Exhibit 11 at pg. 4. Plaintiff expected, based on the representations by Jordan and the plain language of the Lease, that it would be receiving first-class property management services that were similar to those of an unaffiliated, arm's length management company charging competitive rates. This is consistent with the Sooner Enterprise's theft in the other above-identified lawsuits.

63.     JP-Banner, Sooner, Jordan, and Florsheim knew that Sooner was an affiliate, that its management fees were not competitive with the market, and that Sooner had no intention of

providing "first-class" management services, if any at all. The 2017, 2018, and 2019 OPEX Reports falsely represented that the management fees were properly chargeable operating expenses when, in fact, they were not because Sooner's charges exceeded those "rendered by qualified, first-class unaffiliated third parties on a competitive basis." *Id.*

### 4)   Fraudulent Expenses for Salaries & Bonuses

64.   JP-Banner/Sooner also fraudulently misrepresented on the 2017, 2018, and 2019 OPEX Reports that the salaries, benefits, and bonuses of individuals on Sooner's payroll were operating expenses attributable to Plaintiff. The Lease explicitly prohibits inclusion of "[the] wages and benefits of any employee who does not devote substantially all of his or her employed time to the Project" as operating expenses. *See* Exhibit 6 ¶ 1(c)(14). Because Sooner is affiliated with JP-Banner, the Lease excludes any expenses to the extent they exceed those "rendered by qualified, first-class unaffiliated third parties on a competitive basis."  Exhibit 6 ¶ 1(c)(15).

65.   JP-Banner misrepresented that the wages, benefits, and bonuses of seven individuals in 2017, totaling $267,332.10, and eight individuals in 2018, totaling $331,150.22, were operating expenses of Banner Place. *See* Exhibit 13, Audit Report. Because both JP-Banner and Sooner are owned by the same individual—namely, Jordan—not a single one of Sooner's employees was an "unaffiliated" third party, and therefore any expenses that exceeded those "rendered by qualified, first-class unaffiliated third parties on a competitive basis" should have been excluded from operating expenses.

66.   Nor did any of these individuals devote substantially all of their time to the management/operation of Banner Place. To the contrary, under Sooner's management, building personnel was pared down considerably. Under its prior management, Banner Place had a full-time property manager, two full-time engineers, and a full-time administrative assistant on site.

Once JP-Banner purchased Banner Place and hired Sooner as property manager, Sooner's designated property manager "split time" between Banner Place and a neighboring building. Sooner hired but a single engineer and split the single engineer's time between Banner Place and a neighboring building and failed to hire an on-site administrative assistant. The resulting quality of services dropped exponentially after JP-Banner purchased and Sooner managed Banner Place. Maczka was onsite from time to time – often times simply meeting and working with her criminal defense counsel – but she nevertheless was salaried and her purported expenses passed through.

67.    Sooner, JP-Banner, Jordan, Florsheim, and later, Hall knew that these individuals were employees of an affiliated entity, and that the cost of their services exceeded those "rendered by qualified, first-class unaffiliated third parties[.]" Sooner, JP-Banner, Jordan, Florsheim, and later Hall, knew that none of these employees devoted substantially all of their time to Banner Place.  The inclusion of these individuals' salaries as operating expenses in the 2017, 2018, and 2019 OPEX Reports was intentional, fraudulent, and constitutes a material breach of the Lease.

### 5)    Fraudulent costs for janitorial services that were not performed

68.    JP-Banner and Sooner were required to provide janitorial services for Banner Place, the costs of which are considered operating expenses and paid for by Plaintiff. *See* Exhibit 6, at ¶ 7(d). Sooner hired Select Commercial Services ("Select") to perform janitorial services.

69.    As with all other building services, the quality of janitorial services at Banner Place deteriorated to an unacceptable level after JP-Banner purchased Banner Place and Sooner became the property manager. Exhibit I to the Lease lists specifically the janitorial services that JP-Banner is required to provide. *See* Exhibit 6, Exhibit I to Lease. Plaintiff conservatively estimates that only about 9% of these services were actually performed and the fair market value of the actual services rendered was a fraction of the amounts invoiced.

70.     Despite the reduced quality of janitorial services, JP-Banner and/or Sooner fraudulently charged Plaintiff $126,594.54 in operating expenses for janitorial services on the 2017 OPEX Report, $131,223.55 in operating expenses for janitorial services on the 2018 OPEX Report, and $148,385.61 on the 2109 OPEX Report. These charges were fraudulent because only about 9% of these services were actually rendered and the fair market value was a fraction of the amounts invoiced. Including these inflated costs in the OPEX Reports was both fraudulent and a material breach of the Lease.

### 6)     Fictitious costs for janitorial supplies

71.     Once Sooner took over management for Banner Place, the cost of restroom/janitorial supplies curiously increased from $1,827.40 during the base year to $24,547.79, even though the quality of janitorial services had decreased exponentially to a mere fraction of what they were under the prior owner.

72.     Sooner's contract with Select provided that all janitorial supplies were included in the services contract. *See* Exhibit 6, Lease, at ¶ 1 ("Contractor will provide all skilled labor and/or materials, tools and equipment necessary to perform and complete . . . Janitorial Services"). These costs could not, therefore, be operating expenses. This is a fictitious charge.

73.     Sooner, JP-Banner, Jordan, Florsheim, and later Hall, knew that Select provided janitorial supplies under their contract, and that such supplies were not operating expenses for Banner Place. Despite this, JP-Banner and/or Sooner falsely represented that it incurred $24,547.79 in operating expenses for cleaning supplies on the 2017 OPEX Report and $20,286.47 in operating expenses for cleaning supplies on the 2018 OPEX Report.

74.     The 2017, 2018, and 2019 OPEX Reports sent to Plaintiff for operating costs reflecting janitorial expenses, was both fraudulent and a material breach of the Lease.

### 7)      Intentional misallocation of electricity costs

75.      JP-Banner and Sooner also misrepresented the amount of electricity expenses to Plaintiff. Rather than allocating to Plaintiff its pro rata share of common electricity (14% of the electricity cost), JP-Banner/Sooner misrepresented these expenses on the 2017, 2018, and 2019 OPEX Reports by improperly grossing them up, and failing to deduct the annualized electric costs and the annualized pass-thru utilities that were already directly reimbursed by Plaintiff. *See* Exhibit 6, at ¶ 1(c)(2) (excluded from Basic Costs per Section 1(c)(2) of the Lease). Sooner, JP-Banner, Jordan, Florsheim, and later Hall, knew that these charges were falsely grossed up and included in OPEX reports. The 2017, 2018, and 2019 OPEX Reports sent to Plaintiff for operating costs associated with grossed up electricity expenses were fraudulent and a breach of the Lease.

### 8)      Charges for previously reimbursed expenses

76.      JP-Banner and Sooner also submitted duplicate charges to Plaintiff for expenses which they had already received reimbursement. The 2017 OPEX Report charges Plaintiff $4,889.65 for broken windows, even though Sooner received (but failed to credit) insurance proceeds for this expense.

77.      Because JP-Banner and/or Sooner had already been reimbursed for these expenses, they were prohibited from including them as operating expenses on the 2017 OPEX Report. *See* Exhibit 6, Lease, at ¶ 1(c)(3) (explicitly excluding from operating expenses any "[r]epairs, replacements and general maintenance paid by insurance proceeds (or which could have been paid by insurance proceeds had Landlord maintained the insurance required) . . . under the Lease").[12]

---

[12]  There was no legitimate basis for including this expense even if Sooner had not been reimbursed by the insurance company, as it was prohibited from including costs for "repairs, capital or otherwise, resulting from . . . [a] casualty required to be covered by insurance[.]" *See* Exhibit 6, at ¶ 1(c)(22).

78.    Sooner, JP-Banner, Jordan, Florsheim, and later Hall, knew that this window repair expense had already been reimbursed by an insurance carrier. The inclusion of this expense in the 2017 OPEX Report was fraudulent and a breach of the Lease.

**9)    Non-existent security expenses**

79.    JP-Banner and Sooner also attributed full-time security costs as operating expenses on the 2017, 2018, and 2019 OPEX Reports, despite the fact that the security services deteriorated to an unacceptable level after JP-Banner purchased Banner Place and Sooner became the property manager. These representations were fraudulent because full-time security services were not rendered. After the Plaintiff's many reports, the Sooner Enterprise directed security to not walk or otherwise patrol the Plaintiff's office space at any time. Jordon stated that Sooner would pay for a fulltime security officer in Plaintiff's space, but this was an empty emotional response to being confronted about directing building security to stay out of the Plaintiff's leased space.

80.    JP-Banner and Sooner failed to provide the proper access control and security services for the period of time covered in the 2017, 2018, and 2019 OPEX Reports.[13] Once Sooner took over the management of the building, it retained Securitas Security Services USA, Inc. ("Securitas") to perform security services. Since that time, there have been numerous breaches of access and security, including but not limited to, unauthorized entry to the building and parking areas, threatening situations affecting Plaintiff's employees, and numerous thefts of and damage to various items of personal property located in the premises and parking garage. Plaintiff estimates that only about 10% of the security services were actually performed and the fair market value of the security services provided are a fraction of those invoiced.

---

[13] Plaintiff expects to make the same assertions regarding 2020, 2021, and 2022 OPEX Reports if they ever receive the same.

81.     These security breaches continue. As an example, Securitas has not performed security checks of Plaintiff's three floors during business, evening, and weekend hours, as required by the Lease. Paragraph 7(i) of the Lease requires the Landlord to provide a "Courtesy Guard" in the main lobby of the building from 7:00 a.m. through 11:00 p.m. on business days, from 8:00 a.m. through 2:00 p.m. on Saturdays, and from 8:00 a.m. through 3:00 p.m. on Sundays. Nonetheless, on numerous occasions and at various times—including after the New Year—no guard is often present in the main lobby during these hours.

### 10)     Charges for Sooner's office renovation were passed off as "operating expenses."

82.     JP-Banner and Sooner also misrepresented to Plaintiff that expenses related to Jordan's other commercial properties were operating expenses for Banner Place. The 2017 OPEX Report lists $16,253.74 in operating expenses for non-descriptive "HVAC and Fire/Life Safety" services purportedly provided by The Romack Company ("Romack").

83.     Romack is not a HVAC or "Life/Safety Repair" company. Romack is a company that specializes in interior office finishes and was used by Sooner for the buildout of their offices in Banner Place. The invoice for Romack's services references the "10th Fl. Mgt. Office," which is where Jordan's private offices are located.

84.     Notably, in May 2019, Romack brought an action against Sooner and another entity owned and/or controlled by Jordan, JP Aberdeen Partner, LP, styled *The Romack Company vs. J-P Aberdeen Partners, LP, et al.*, Case No. DC-19-06670 (Dallas County May 9, 2019). The lawsuit alleges that "Defendant JP Aberdeen Partners, LP (by and through Sooner who at all times mentioned was Jordan's acting agent and was acting within the course and scope of employment), entered into agreements . . . [with Romack] to make certain improvements, repairs, renovations or build-outs to JP-Aberdeen Partners, LP's commercial real property" located at 14841 N. Dallas

Parkway, Dallas, Texas 75254 (legally described as "ABERDEEN QUORUM"). *Id.* The action alleges that Sooner failed to reimburse Romack for $433,165 owed to it, despite the fact that Sooner's tenants had already paid Sooner for Romack's services. *Id.* ("pursuant to the Lease Agreement between JP-Aberdeen Partners, LP and Republic, Republic has paid JP-Aberdeen Partners, LP for [Romack's services]").

85.     JP-Banner, Sooner, Jordan, Florsheim, and later, Hall, knew that charges from Romack were not operating expenses for Banner Place. JP-Banner, Sooner, Jordan, Florsheim, and later, Hall, included these expenses in the 2017 OPEX Report to Plaintiff, and falsely attributed them to operating expenses for Banner Place.

### 11)     Fraudulent expenses for unrelated banking fees

86.     JP-Banner and Sooner also misrepresented banking fees as operating expenses in the 2017 and 2018 OPEX Reports, despite the express exclusion of such expenses as operating expenses under the Lease. *See* Exhibit 6, at ¶ 1(c)(8) (noting that costs associated with indebtedness secured by liens are excluded from expenses).

87.     JP-Banner and/or Sooner charged Plaintiff as expenses the following bank fees: (a) $11,842.92 for bank fees in 2017, of which $9,620.05 related to a Wells Fargo Bank lock box account (belonging to FBO RCC Real Estate, Inc., JP-Banner's lender); and (b) $12,235.28 of banks fees in 2018, of which $9,716.71 related to the Wells Fargo Bank lock box account.  The inclusion of these expenses on the 2017 and 2018 OPEX Reports was fraudulent and a breach of the Lease.

### 12)     Duplicate expenses for elevator repairs

88.     JP-Banner and Sooner also included expenses in operating expense reports that were duplicative of other operating expense reports. For instance, JP-Banner and/or Sooner represented in the 2018 OPEX Report that the building had incurred $1,829.04 in operating

expenses for elevator repairs, despite an identical expense for the exact same repair in the 2017 OPEX Report.

### 13)    Miscellaneous items charged as expenses

89.    JP-Banner and Sooner also misrepresented in the 2017 and 2018 OPEX Reports that miscellaneous charges for taxes, licensing, travel mileage, meals, uniforms, and entertainment were legitimate operating expenses, despite their knowledge that these charges were unrelated to the management and/or operation of Banner Place.

90.    JP-Banner, Sooner, Jordan, Florsheim, and later, Hall, submitted, or caused to be submitted, the following charges in the 2018 OPEX Report: (a) $937.50 for "Dues & Subscriptions"; (b) $2,419.68 for non-descript "Taxes/Licenses"; (c) $888.56 for "Travel Mileage"; and (d) $1,364.22 for "Meals & Entertainment." *See* Exhibit 13, 2017-2018 Audit; Exhibit 10 and 11, 2017 and 2018 OPEX Reports. JP-Banner and Sooner also submitted, or caused to be submitted, the following charges in the 2017 OPEX Report: (a) $200.00 for "Taxes/Licensing"; (b) $512.92 for "Travel Mileage""; and (c) $1,035.98 for "Meals and Entertainment."    Exhibit 10 and 11, 2017 and 2018 OPEX Reports. Sooner, a property management company, would have no basis to incur any expenses in these categories that could even remotely be classified as operating expenses owed by a tenant. The inclusion of these expenses on the 2017 and 2018 OPEX Reports was fraudulent and a breach of the Lease.

### 14)    Plaintiff's justifiable reliance

91.    JP-Banner and Sooner submitted, or caused to be submitted to Plaintiff, annual operating expense reports for 2017, 2018, and 2019. These expenses described in these invoices and reports were not charges for actual or legitimate operating expenses of the building.

92.     In addition, on information and belief, Jordan and Maczka, either personally or through Jordan's entities (including JP-Banner and/or Sooner), have received kickbacks from third party vendors hired to perform the services mentioned above.

93.     Based on the above, Plaintiff should have been credited at least $419,007.00 for operating expenses in 2017 and 2018 and at least $104,601 for operating expenses in 2019.[14] *See* Exhibit 13 at pg. 2 and Exhibit 14 at pg. 2. Rather than issuing the appropriate credit, however, JP-Banner, Sooner, Jordan, Florsheim, and later, Hall deliberately "cooked the books" to bilk excessive rent payments from Plaintiff.

94.     Indeed, in accordance with the Lease, Plaintiff hired RSM US LLP ("RSM") to audit the 2019 OPEX Report. RSM's audit revealed (once again) that Sooner and JP-Banner had fraudulently overstated the Basic Costs by more than 5%. *See* Exhibit 6, Exhibit 14. Despite the findings of the RSM audit and paragraph 3(d) of the Lease which provides, "if the final audit shows that the Landlord's calculation of Basic Costs for the calendar year(s) under inspection was overstated by more than five percent (5%), then, Landlord shall pay Tenant's actual reasonable out-of-pocket audit and inspections fees applicable to the review of the effected calendar year statement," JP-Banner refused payment and instead provided fraudulent justification(s) for the overcharges.

**D.     JP-Banner Assigns The Banner Place Loan To Create Additional Income for the Sooner Enterprise.**

95.     To purchase Banner Place in 2017, RCC Real Estate, Inc. ("RCC"), made a loan to JP-Banner in the amount of $23,100,000.00 (the "Loan") secured in part by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("DOT") granting RCC

---

[14] Plaintiff has not received an OPEX Report for 2020 and 2021.

a lien encumbering Banner Place. In connection with the loan, Mark Jordan executed a Guaranty of Recourse Obligations in favor of RCC.

96.     On or about June 30, 2020, RCC executed an Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Loan Assignment"), whereby, RCC transferred, sold and assigned its interest in the DOT and other loan documents pertaining to the Loan (together with the DOT, the "Loan Documents") to Liberty Bankers Life Insurance Company, an Oklahoma life insurance company ("LBLIC").

97.     Contemporaneously with the Loan Assignment, LBLIC, JP-Banner, and Jordan executed a Third Amendment to Deed of Trust (the "DOT Amendment"). According to the DOT Amendment, at the time of the Loan Assignment, the principal balance of the Loan was $17,934,183.62. The DOT Amendment, among other things:  (i) increased the principal balance of the Loan to $21,500,000.00; (ii) changed Applicable Interest Rate of the Loan to 5.3%; (iii) extended the maturity date of the Loan to March 31, 2022 and granted two extensions; (iv) provided JP-Banner with access to a tenant improvement and capital reserve account in the amount of $3,684,000.00; (v) ratified payment to Lender of a commitment fee in the amount of $273,358.00; and (vi) ratified payment to JP-SF Partners, LLC ("JP-SF"), an affiliate of Jordan and Florsheim, in the amount of $215,000.00 for a purported broker's commission.  It is unknown if JP-SF Partners, LLC is properly licensed to receive a broker's commission related to a loan transaction.[15]

---

[15] After investigation, Plaintiff has discovered several different properties owned by Jordan entities which had its loan assigned to and/or refinanced by LBLIC. On several occasions, contemporaneous with the assignment and/or refinance of the loan, LBLIC increased the loan amount due by the borrower (*i.e.* Jordan).

98.     The Loan Assignment was not disclosed to Plaintiff, and any consideration justifying the increase in the Loan amount and fees paid to LBLIC and JP-SF is unknown. If instead JP-Banner had attempted to refinance the Loan, then Plaintiff would have almost certainly been required by the new lender to execute a subordination agreement and an estoppel certificate, where Plaintiff would have had the opportunity to disclose to the new lender the Sooner Enterprise's scheme to defraud its tenants out of operational expenses, the many breaches under the Lease, and other bad acts effectuated by the Sooner Enterprise.  The new lender would have known of the now public Federal Criminal Investigation.

99.     It is unknown what JP-Banner disclosed to LBLIC regarding the Plaintiff's claims and damages. It is also unknown to Plaintiff, whether or not JP-Banner has withdrawn any of the capital reserves. If any reserves have been withdrawn, at most a *de minimis* amount of these funds have been used for tenant improvements.

**E.     Alter Ego**

100.    Whenever it is alleged in this pleading that JP-Banner, JP-Banner GP, Sooner, JP-Realty, and/or Banner Investors did (or failed to do) an act, it is also meant that such conduct was done by employees, contractors, principals, agents, and/or representatives of JP-Banner, JP-Banner GP, Sooner, JP-Realty, and/or Banner Investors, or ratified by JP-Banner, JP-Banner GP, Sooner, JP-Realty, and/or Banner Investors, or done with such apparent authority so as to cause Plaintiff to reasonably and justifiably rely on such wrongful acts or omissions.  JP-Banner, JP-Banner GP, Sooner, JP-Realty, and/or Banner Investors are vicariously liable for the conduct of their employees, contractors, principals, agents, and/or representatives, by virtue of the doctrines of respondeat superior, agency, apparent authority, ostensible agency, ratification, and/or estoppel.

101.    Jordan, Florsheim, Maczka, and Hall used JP-Banner, JP-Banner GP, Sooner, JP-Realty, and/or Banner Investors to perpetrate fraud on Plaintiff and/or they knowingly participated

in the Sooner Enterprise's fraudulent schemes, as described above. As a result, they are personally liable for their conduct. Jordan's dominion and control over JP-Banner, JP-Banner GP, Sooner, JP-Realty, and/or Banner Investors extends to their policies, business practices, and finances, such that each entity is simply an instrumentality or business conduit for Jordan to perpetrate fraud. At all relevant times hereto, Jordan has been, and currently is, in control of these Defendants and: (a) caused them to be used for the purpose of perpetrating, and did perpetrate, an actual fraud on Plaintiff for the direct personal benefit of Jordan and his entities; (b) organized and operated these Defendants as a mere tool or business conduit of another; and (c) used them to protect against the discovery of a crime or to justify a wrong.

102.    JP-Banner, JP-Banner GP, Sooner, JP-Realty, and/or Banner Investors are the alter-egos of Jordan, and Jordan completely controls, dominates, manages, and operates them to suit his convenience, such that a unity of interest exists between them and any separateness has ceased to exist. As a result, Jordan is personally liable for the conduct of JP-Banner, JP-Banner GP, Sooner, JP-Realty, and/or Banner Investors.

## VI.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### FRAUD AND/OR FRAUDULENT INDUCEMENT
### (Jordan, Florsheim, Hall, JP-Banner, Sooner, JP Banner GP)

103.    Plaintiff incorporates, adopts, and realleges the allegations in each of the paragraphs above, as if fully set forth herein.

104.    Defendants intentionally and knowingly made material omissions and/or false and fraudulent statements of material fact to Plaintiff regarding improvements and management of the building.

105.     The knowingly false statements of material fact and/or material omissions include: (a) Jordan, Florsheim, Hall, JP-Banner, Sooner, and JP Banner GP's misrepresentations regarding $750,000 of capital improvements and management of the building; and (b) representations in each and every invoice and the 2017, 2018, and 2019 OPEX Reports that the expenses listed in those documents were for legitimate operating expenses of the building when, in fact, they were not, because they either did not relate to the management or operation of the building, were not reimbursable under the Lease, or were for fictitious services that were never rendered.

106.     Jordan, Florsheim, Hall, JP-Banner, Sooner and JP Banner GP knew that the above-described misrepresentations were made to Plaintiff were false and fraudulent at the time they were made.

107.     Jordan, Florsheim, Hall, JP-Banner, Sooner, and JP Banner GP made the above-described misrepresentations and/or material omissions and engaged in such conduct to induce Plaintiff into relying on the misrepresentations and/or material omissions and to pay JP-Banner for fraudulent charges. In reliance on such representations and/or material omissions, Plaintiff entered into the Sixth Amendment to the Lease and paid for operating expenses that were not legitimate.

108.     As a result of its justifiable reliance on Jordan, Florsheim, Hall, JP-Banner, Sooner, and JP Banner GP's misrepresentations, Plaintiff has incurred damages.

109.     Jordan, Florsheim, Hall, JP-Banner, Sooner, and JP Banner GP's willful, reckless, and/or wanton conduct further entitles Plaintiff to punitive damages.

### SECOND CLAIM FOR RELIEF
### SUBSTANTIVE RICO—VIOLATION OF 18 U.S.C. § 1962(c)
### (Against Jordan, Hall, Maczka, Florsheim, JP-Banner, Sooner, JP Banner GP, JP Realty Partners, and Banner Investors)

110.     Plaintiff incorporates, adopts, and realleges the allegations in each of the paragraphs above, as if fully set forth herein.

111.    The Sooner Enterprise is an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

112.    Jordan is and has been employed by and/or associates with the Sooner Enterprise.

113.    Since at least 2016, and continuing uninterrupted to the present, Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Sooner Enterprise's affairs through a pattern of racketeering activity consisting of violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the above-described scheme to defraud Plaintiff by mailing and/or and causing to be mailed rental invoices and other communications related thereto which caused Plaintiff to pay funds to JP-Banner, and subsequently directing Sooner to issue fraudulent 2017, 2018, and 2019 OPEX Reports and communications related thereto, which defrauded Plaintiff out of its personal property.

114.    Jordan, via his company Sooner, mailed Plaintiff in whole or in part rental invoices, the 2017, 2018, and 2019 OPEX Reports, and follow up communications in furtherance of a scheme to defraud Plaintiff and with the intent to cause Plaintiff to wire and/or mail funds for operational costs which Jordan, at all times relevant, intended to convert or steal from Plaintiff.

115.    On May 23, 2019, Jordan, via his company, Sooner, sent correspondence via mail to Plaintiff containing 2018 Reconciliation Statement, 2018 Actuals Backup, 2018 Gross UP Backup, and Revised 2017 OPEX Reconciliation statements. This correspondence was in furtherance the fraudulent scheme (fully detailed below) intended to defraud Plaintiff out of its personal property, in violation of the federal mail fraud statute 18 U.S.C. § 1341. The correspondence, as detailed specifically below, was sent by Janet Hetmer, Senior Property Manager of Sooner, via hand delivery and via mail, to Plaintiff where it was received and reviewed by Plaintiff and select partners.

116.    On January 6, 2021, Jordan and Florsheim, via Jordan's company, Sooner, sent correspondence to Plaintiff via mail containing the 2019 Actuals, the 2019 General Ledger, and the 2019 Final OPEX. This correspondence was in furtherance of the fraudulent scheme (fully detailed below) intended to defraud Plaintiff out of its personal property in violation of the federal mail fraud statute 18 U.S.C. § 1341. The correspondence, as detailed specifically below, was directed by Scot Florsheim on December 29, 2020, to be sent by Louann Hall, Regional Director – Property Management, to a partner at Plaintiff. The correspondence was actually sent by Louann Hall to the partner on January 6, 2021, where it was reviewed by Plaintiff.

117.    The rental invoices (a portion of which were mailed) and 2017, 2018, and 2019 OPEX Reports and follow up communications were used in furtherance of the fraudulent scheme because they misrepresent, among other things, the following:

### 2017 OPEX Report

- That the operating expenses in the report were legitimate when, in fact, they were not because they artificially inflated grossed up calculations by nearly 5,000 square feet, enabling JP-Banner and Sooner to recoup phantom operating expenses that did not exist.

- That the building incurred $92,204.13 in operating expenses for repair and maintenance of the common areas when, in fact, it did not, because these items were not impacted by the occupancy of the building and therefore cannot be grossed up.

- That the building incurred $190,756.46 in operating expenses for management services that were provided by an unaffiliated, first-class management company at as competitive market rate when, in fact, it did not because Sooner is an affiliated entity that performed substandard management fees at a rate that was not competitive.

- That the building incurred $88,959 in legitimate operating expenses for salaries, wages, and benefits to unaffiliated employees who devoted substantially all of their time to the operation and management of the building when, in fact, it did not because the expenses were for affiliated individuals who did not devote substantially all of their time to the building.

- That the building incurred $131,223.55 in operating expenses for janitorial services when, in fact, it did not because substantially less than the alleged services were actually rendered.

- That the building incurred $25,547.79 in operating expenses for janitorial supplies when, in fact, it did not because cleaning supplies were included in the contract with the vendor providing janitorial services.

- That the building incurred $90,079.08 in operating expenses for electricity costs when, in fact, it did not because Plaintiff reimbursed these expenses directly to the vendor.

- That the building incurred $160,294.08 in legitimate operating expenses for security costs when, in fact, it did not because the security services were substandard and were not rendered.

- That the building incurred $9,620.05 in operating expenses for banking fees when, in fact, it did not because these costs were not related to the operation and management of the building.

**2018 OPEX Report**

- That the operating expenses in the report were legitimate when, in fact, they were not because they artificially inflated grossed up calculations by nearly 5,000 square feet, enabling JP-Banner and Sooner to convert phantom operating expenses that did not exist.

- That the building incurred $115,340.95 in legitimate operating expenses for repair and maintenance of the common areas when, in fact, it did not because these items were not impacted by the occupancy of the building and therefore could not be grossed up.

- That the building incurred $212,882.26 in operating expenses for management services that were provided by an unaffiliated, first-class management company at a competitive market rate when, in fact, it did not because Sooner is an affiliated entity that performed substandard management services at a rate that was not competitive.

- That the building incurred $152,777 in legitimate operating expenses for salaries, wages, and benefits to unaffiliated employees who devoted substantially all of their time to the operation and management of the building when, in fact, it did not because the expenses were for affiliated individuals who did not devote substantially all of their time to the building.

- That the building incurred $126,594.54 in operating expenses for janitorial services when, in fact, it did not because substantially less than the alleged services were actually rendered.

- That the building incurred $20,286.47 in operating expenses for janitorial supplies when, in fact, it did not because cleaning supplies were included in the contract with the vendor providing janitorial services.

- That the building incurred $159,324.00 in operating expenses for electricity costs when, in fact, it did not because Plaintiff reimbursed these expenses directly to the vendor.

- That the building incurred $4,889.65 in operating expenses for window glass repair when, in fact, it did not because these costs were already reimbursed by the insurance company.

- That the building incurred $168,094.46 in legitimate operating expenses for security costs when, in fact, it did not because the security services were substandard and/or were not rendered.

- That the building incurred $16,253.74 in operating expenses for HVAC repair when, in fact, it did not because such services were never rendered to the building, but rather, were personal expenses of Jordan.

- That the building incurred $11,842.92 in operating expenses for banking fees when, in fact, it did not because these costs were not related to the operation and management of the building.

- That the building incurred $1,829.04 in operating expenses for elevator repairs when, in fact, it did not because this expense was duplicated in the 2017 OPEX Report.

- That the building incurred operating expenses for travel and entertainment when, in fact, it did not because these costs were not related to the operation and management of the building.

**2019 OPEX Report**

- That the operating expenses in the report were legitimate when, in fact, they were not because they artificially inflated grossed up calculations by 27,019 square feet, enabling JP-Banner and Sooner to recoup phantom operating expenses that did not exist.

- That the building incurred $193,465.95 in operating expenses for management services that were provided by an unaffiliated, first-class management company at as competitive market rate when, in fact, it did not because Sooner is an affiliated entity that performed substandard management fees at a rate that was not competitive.

- That the building incurred $279,096.31 in legitimate operating expenses for salaries, wages, and benefits to unaffiliated employees who devoted substantially all of their time to the operation and management of the building when, in fact, it did not because the expenses were for affiliated individuals who did not devote substantially all of their time to the building.

- That the building incurred $104,008.94 in operating expenses for janitorial services when, in fact, it did not because substantially less than the alleged services were actually rendered.

- That the building incurred $19,907.44 in operating expenses for janitorial supplies when, in fact, it did not because cleaning supplies were included in the contract with the vendor providing janitorial services.

- That the building incurred $1,595.06 in operating expenses for window glass repair when, in fact, it did not because these costs were already reimbursed by the insurance company.

- That the building incurred $204,206.39 in legitimate operating expenses for security costs when, in fact, it did not because the security services were substandard and/or were not rendered.

- That the building incurred $1,125.25 in operating expenses for banking fees when, in fact, it did not because these costs were not related to the operation and management of the building.

- That the building incurred $39,576.89 in operating expenses for elevator repairs when, in fact, it did not because the elevators have been reduced in capacity and any alleged maintenance/repairs related to the upgrade that Defendants were obligated to provide in an attempt to make the Building a Class A office space.

- That the building incurred $2,501.66 in operating expenses for travel, mileage, meals and education when, in fact, it did not because these costs were not related to the operation and management of the building.

118.    The invoices, 2017 OPEX Report, 2018 OPEX Report, 2019 OPEX Report, and corresponding communications, a portion of which were in the form of mailings, which comprise the Sooner Enterprise's pattern of racketeering activity identified through the date of this Complaint are described in Exhibit 13, 2017 and 2018 Audit; Exhibit 10 and 11, 2017 and 2018 OPEX Reports; Exhibit 14, 2019 Audit; and Exhibit 12, 2019 OPEX Report.

119.    Per the Lease, Plaintiff engaged an independent third-party auditor to conduct a lease audit of operating expenses reported by JP-Banner in the 2017, 2018, and 2019 OPEX Reports.

120.    The results of the audit on the 2017 and 2018 charges are contained in a report dated October 31, 2019, which reveal that Defendants overcharged Plaintiff by $1,025,222 for calendar year 2018 and $791,651 for calendar year 2017 by incorrectly allocating Plaintiff's Proportionate

Share of net rentable space, charging an excessive property management fee, and including costs that should have been excluded pursuant to the Lease. Exhibit 13, 2017 and 2018 Audit Report. The Audit Report was provided to the Defendants.

121.    Despite Plaintiff's audit of the 2017 and 2018 OPEX Reports and the independent auditor's finding of impermissible charges, improperly grossed up expense, and incorrect allocation of Plaintiff's Proportionate Share of net rentable space, Defendants continued their fraudulent pattern of charges to Plaintiff.

122.    The results of the audit on the 2019 charges are contained in a report dated July 8, 2021, which reveal that Defendants overcharged Plaintiff by at least $104,601 for calendar year 2019 by incorrectly allocating Plaintiff's Proportionate Share of net rentable space and charging excessive property management fees. Exhibit 14, 2019 Audit Report. The 2019 Audit Report was provided to Defendants.

123.    The 2019 Audit Report does not take into account fraudulently charged fees such as services and supplies charged but not provided, fraudulently charged salaries, and the pattern of wrongdoing alleged *infra* that were included in the 2017 and 2018 OPEX Report. Even excluding these fraudulent expenses, it is undisputed that JP-Banner by and through Sooner and the individual Defendants knowingly created fraudulent expenses to overcharge Plaintiff over $100,000 for calendar year 2019 and/or participated in the scheme to accomplish such overcharges.

124.    Based upon the similarity of charges in the 2017 and 2018 OPEX Reports and Defendants' pattern and practice of fraud, Plaintiff believes that Defendants have consistently and intentionally overcharged Plaintiff since they took over the ownership and management of Banner Place. Indeed, the 2019 Auditor, in its review of the 2017 and 2018 OPEX Reports, determined that Plaintiff was overcharged at least $177,222. *See* Exhibit 13, pg. 11.

125.    Each use of the mail to send Plaintiff documents, reports, invoices, and other communications as part of the Sooner Enterprise's scheme to defraud Plaintiff is an act which is indictable as mail fraud and together these actions constitute a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

126.    Plaintiff has incurred damages as a result of Defendants' unlawful acts and omissions. The documentation described above was used in furtherance of the fraudulent scheme that Jordan submitted, or caused to be submitted through Sooner, was a substantial factor in inducing Plaintiff to pay for operating expenses that it would not have paid had it known the invoices and 2017, 2018, and 2019 OPEX Reports were materially false. Plaintiff was the intended target of the Sooner Enterprise's scheme, and its damages are directly related to a natural consequence of the scheme.

127.    As a result, Plaintiff is entitled to damages in excess of $1 million, or to an amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme.

128.    Under 18 U.S.C. § 1964(d) Plaintiff is entitled to treble damages and costs of suit, including its reasonable attorney's fees.

**THIRD CLAIM FOR RELIEF**
**SUBSTANTIVE RICO—VIOLATION OF 18 U.S.C. § 1962(c)**
**(Against Jordan, Hall, Maczka, Florsheim, JP-Banner, Sooner, JP Banner GP, JP Realty**
**Partners, and Banner Investors)**

129.    Plaintiff incorporates, adopts, and realleges the allegations in each of the paragraphs above, as if fully set forth herein.

130.    The Sooner Enterprise is an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

131.    Jordan is and has been employed by and/or associates with the Sooner Enterprise. Since at least 2016, and continuing uninterrupted to the present, Jordan has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Sooner Enterprise's affairs through a pattern of racketeering activity consisting of violations of the federal money laundering statute, 18 U.S.C. § 1956(a)(1)(A)(i) (promotion). Jordan, via his company JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, obtained proceeds from the above-described scheme to defraud Plaintiff by submitting and causing to be mailed (in part) rental invoices, operational expense reports, and other communications which caused Plaintiff to pay funds to JP-Banner and subsequently directing Sooner to issue the fraudulent 2017, 2018, and 2019 OPEX Reports thereby defrauding Plaintiff out of its personal property.  A portion of the invoices, operating reports, and other communications were sent to Plaintiff via mail.

132.    Knowing that those proceeds were obtained from a specified unlawful activity (mail fraud) as that term is defined by 18 U.S.C. § 1956(c)(7)(A), Jordan, via JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, performed numerous financial transactions as that term is defined by 18 U.S.C. § 1956(c)(4) with the intent to promote or further their unlawful scheme.

133.    Specifically, Jordan, via his companies, including but not limited to, JP-Banner and/or Sooner, conducted financial transactions when they utilized proceeds of the scheme to pay salaries of employees, who were hired as part of the fraudulent effort to increase expenses. Additionally, Jordan, via his companies, including but not limited to, JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, utilized the proceeds of the scheme to pay for the substandard vendors for which Plaintiff was charged fictious and inflated operating expenses. On information and belief, Jordan, via his companies including but not limited to JP Banner and/or Sooner, in

furtherance of the Sooner Enterprise, have conducted numerous additional financial transactions in furtherance of the illicit scheme.

134.   On information and belief, Jordan, via his companies, including but not limited to, JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, utilized a financial institution which is engaged in or the activities of which affect interstate commerce to send money to employees, to pay the various vendors hired to perform work at Banner Place, and to conduct numerous additional transactions.

135.   Each financial transaction Defendants performed utilizing the proceeds of the scheme to promote or further the scheme is an act which is indictable as money laundering (promotion) and together these actions constitute a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

136.   Plaintiff has incurred damages as a result of Defendants' unlawful acts and omissions. As just one example, by laundering the proceeds of Defendants' unlawful scheme, Defendants have made it more difficult for Plaintiff to recover the illegally obtained proceeds. Plaintiff was the intended target of the scheme, and its damages are directly related to a natural consequence of the scheme.

137.   As a result, Plaintiff is entitled to damages in excess of $1 million, or to an amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme.

138.   Under 18 U.S.C. § 1964(d) Plaintiff is entitled to treble damages and costs of suit, including its reasonable attorney's fees.

**FOURTH CLAIM FOR RELIEF**
**SUBSTANTIVE RICO—VIOLATION OF 18 U.S.C. § 1962(c)**
**(Against Jordan, Hall, Maczka, Florsheim, JP-Banner, Sooner, JP Banner GP, JP Realty Partners, and Banner Investors)**

139.    Plaintiff incorporates, adopts, and realleges the allegations in each of the paragraphs above, as if fully set forth herein.

140.    The Sooner Enterprise is an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

141.    Jordan is and has been employed by and/or associates with the Sooner Enterprise. Since at least 2016, and continuing uninterrupted to the present, Jordan has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Sooner Enterprise's affairs through a pattern of racketeering activity consisting of violations of the federal money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(i) (concealment). Jordan, via his company JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, obtained proceeds from the above-described scheme to defraud Plaintiff by submitting and causing to be mailed (in part) rental invoices, operational reports, and other communications which caused Plaintiff to pay funds to JP-Banner and subsequently directing Sooner to issue and mail fraudulent 2017, 2018, and 2019 OPEX Reports thereby defrauding Plaintiff out of its personal property.

142.    Knowing that those proceeds were obtained from a specified unlawful activity (mail fraud) as that term is defined by 18 U.S.C. § 1956(c)(7)(A), Jordan, via his companies, including but not limited to JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, performed numerous financial transactions as that term is defined by 18 U.S.C. § 1956(c)(4) with the intent to conceal or disguise the nature or source of the illegal proceeds.

143.    Specifically, Jordan, via his companies, including but not limited to JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, conducted financial transactions when he

sent proceeds of the scheme to other Defendants purporting to be legitimate business profits. In this way, Defendants sought to conceal the true nature of the payments as the proceeds of illegal activity.

144.    On information and belief, Jordan, via his companies, including but not limited to JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, utilized a financial institution which is engaged in or the activities of which affect interstate commerce both to send money to Jordan and various other entities in the Sooner Enterprise.

145.    Each financial transaction Defendants performed utilizing the proceeds of the scheme to conceal or disguise the nature of the proceeds is an act which is indictable as money laundering (concealment) and together these actions constitute a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

146.    Plaintiff has incurred damages as a result of Defendants' unlawful acts and omissions. As just one example, by laundering the proceeds of Defendants' unlawful scheme, Defendants have made it more difficult for Plaintiff to recover the illegally obtained proceeds. Plaintiff was the intended target of the scheme, and its damages are directly related to a natural consequence of the scheme.

147.    As a result, Plaintiff is entitled to damages in excess of $1 million, or to an amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme.

148.    Under 18 U.S.C. § 1964(d) Plaintiff is entitled to treble damages and costs of suit, including its reasonable attorney's fees.

**FIFTH CLAIM FOR RELIEF**
**SUBSTANTIVE RICO—VIOLATION OF 18 U.S.C. § 1962(c)**
**(Against Jordan, Hall, Maczka, Florsheim, JP-Banner, Sooner, JP Banner GP, JP Realty**
**Partners, and Banner Investors)**

149.    Plaintiff incorporates, adopts, and realleges the allegations in each of the paragraphs above, as if fully set forth herein.

150.    The Sooner Enterprise is an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

151.    Jordan is and has been employed by and/or associates with the Sooner Enterprise. Since at least 2016, and continuing uninterrupted to the present, Jordan has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Sooner Enterprise's affairs through a pattern of racketeering activity consisting of violations of the federal money laundering statute, 18 U.S.C. § 1957 (monetary transactions). Jordan, via his companies, including but not limited to JP-Banner and/or Sooner, obtained proceeds from the above-described scheme to defraud Plaintiff by submitting and causing to be mailed (in part) rental invoices, operating reports, and other communications which caused Plaintiff to pay funds to JP-Banner and subsequently directing Sooner to issue fraudulent 2017, 2018, and 2019 OPEX Reports thereby defrauding Plaintiff out of its personal property.

152.    Knowing that those proceeds were criminally derived property as defined by 18 U.S.C. § 1957(f)(2) which criminal offense is a specified unlawful activity (mail fraud) as that term is defined by 18 U.S.C. § 1957(f)(3), Jordan, via his companies, including but not limited to JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, performed numerous monetary transactions as that term is defined by 18 U.S.C. § 1957(f)(1) of a value greater than $10,000.

153.    As a perpetrator of the scheme, Jordan, via his companies, including but not limited to, JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, were aware that the proceeds

from the scheme were illegally obtained through the above-described mail fraud. Through Defendants scheme, they have obtained over $1 million of Plaintiff's money. On information and belief, Jordan, via his companies, including but not limited to JP-Banner and Sooner, in furtherance of the Sooner Enterprise, have distributed that money to vendors, employees, and other Defendants through use of a financial institution and at least two of those transactions were for an amount greater than $10,000.

154.    Specifically, Jordan, via his company Sooner, in furtherance of the Sooner Enterprise, used proceeds from the scheme by paying salaries totaling $267,332.10 to seven employees in 2017 and $331,150.22 to eight employees in 2018. The payments of these salaries represent at least two monetary transactions in an amount greater than $10,000. On information and belief, Jordan, via his companies, including but not limited to JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, have engaged in numerous additional monetary transactions each exceeding $10,000 in payments to vendors and distribution of proceeds to other Defendants all of which used proceeds from the scheme.

155.    On information and belief, Jordan, via his companies, including but not limited to, JP-Banner and/or Sooner, in furtherance of the Sooner Enterprise, utilized a financial institution which is engaged in or the activities of which affect interstate commerce to pay the salaries of all employees in 2017 and 2018, to make payments to vendors, and to distribute proceeds to other Defendants.

156.    Each monetary transaction Defendants performed utilizing the proceeds of the scheme in an amount greater than $10,000 is an act which is indictable as money laundering (monetary transactions) and together these actions constitute a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

157.    Plaintiff has incurred damages as a result of Defendants' unlawful acts and omissions. Plaintiff was the intended target of the scheme, and its damages are directly related to a natural consequence of the scheme.

158.    As a result, Plaintiff is entitled to damages in excess of $1 million, or to an amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme.

159.    Under 18 U.S.C. § 1964(d) Plaintiff is entitled to treble damages and costs of suit, including its reasonable attorney's fees.

## SIXTH CLAIM FOR RELIEF
## CIVIL CONSPIRACY
### (Against Jordan, Florsheim, Hall, Maczka, JP-Banner, Sooner, JP Banner GP, JP Realty Partners, and Banner Investors)

160.    Plaintiff incorporates all of the allegations in each of the paragraphs above, as if fully set forth herein.

161.    Jordan, Florsheim, JP-Banner, Sooner, Hall, Maczka, JP Banner GP, JP Realty Partners, and Banner Investors were members of a combination of two or more persons who combined to accomplish the unlawful purposes of, among other things, and as described in more detail above, committing fraud and/or conversion, bilking Plaintiff with excessive charges and/or rent; wrongfully exercising dominion over the personal property of Plaintiff.

162.    Jordan, Florsheim, JP-Banner, Sooner, Hall, Maczka, JP Banner GP, JP Realty Partners, and Banner Investors had a meeting of minds on the above object and/or courses of action.

163.    At least one member of the conspiracy committed one or more unlawful, overt acts as described above to further the above object and/or courses of action.

164.     As a result of the conspiracy, Plaintiff has suffered damages in an amount to be determined at trial for which Jordan, Florsheim, JP-Banner, Sooner, Hall, Maczka, JP Banner GP, JP Realty Partners, and Banner Investors are jointly and severally liable.

### SEVENTH CLAIM FOR RELIEF
### BREACH OF CONTRACT
### (JP-Banner)

165.     Plaintiff incorporates, adopts, and realleges the allegations in each of the paragraphs above, as if fully set forth herein.

166.     Plaintiff entered into the Lease with Gaedeke Holdings II, Ltd., on May 30, 2007. Exhibit 6. JP-Banner assumed that Lease and the landlord and property management services from Gaedeke when it purchased Banner Place in 2017.

167.     The Lease is a valid and enforceable contract between Plaintiff and JP-Banner.

168.     Plaintiff performed under the contract by paying all amounts due and owing as set forth therein.

169.     JP-Banner materially and systematically breached the Lease.

170.     First, the Lease provides that the landlord can "gross-up" all basic costs that "vary with occupancy as if Banner Place has been 95% occupied and … services had been provided to the entire Building during that calendar year[.]" Exhibit 6 at ¶ 1(k). JP-Banner, through Sooner, used this provision of the Lease to fraudulently gross up several categories of expenses that were not – and could not be – impacted by occupancy of the building. JP-Banner therefore purposely overcharged Plaintiff in breach of the Lease.

171.     Second, Paragraph 7(i) of the Lease requires the Landlord to provide a "Courtesy Guard" in the main lobby of the building during certain designated times. Exhibit 6 at ¶ 7(i). JP-Banner, however, has failed to provide any "Courtesy Guard" during the required times, causing harm to Plaintiff and in breach of the Lease.

172.    Third, the Sixth Amendment to the Lease requires JP-Banner to "provide $750,000 for Building lobby and elevator cab finishes, furniture and artwork, and other capital improvements to the common areas. Landlord agrees that the plans for the lobby and elevator cabs (and building exterior, if any) shall be mutually acceptable to Tenant and Landlord." Exhibit 6, Sixth Amendment to Lease Agreement. JP-Banner failed to upgrade the building or make the improvements required by the Sixth Amendment, in breach of the Lease.

173.    Fourth, paragraph 7(d) of the Lease requires the Landlord to furnish "janitorial service" that complies with Exhibit I, that provides high quality specifications for janitorial services. Exhibit 6, ¶ 7(d) and Exhibit I. JP-Banner failed to provide the janitorial services required by Paragraph 7(d) and Exhibit I of the Lease, in breach of the Lease.

174.    Fifth, paragraph 12 of the Lease requires the Landlord to maintain and make any necessary repairs to Common Areas, which includes the parking garage. *See* Exhibit 6, ¶ 12 and ¶ 1(h). Despite JP-Banner's requirement to maintain and make necessary repairs to the Common Areas, including the parking garage, the concrete parking garage is now in such disrepair that large pieces of the concrete ceiling are now falling onto the parking garage floor below, causing a dangerous situation to both tenants and their vehicles. Plaintiff notified JP-Banner of the dangerous condition of the parking garage on July 8, 2021, and demanded that its safety be confirmed by a licensed structural engineer.

175.    Sixth, pursuant to paragraph 1(c) of the Lease, JP-Banner is limited in the types of expenditures which may be charged to Plaintiff as operational costs. As set-forth above, JP-Banner regularly charged Plaintiff for costs that were excluded from the types of expenditures which JP-Banner could charge Plaintiff.

176.    Seventh, pursuant to paragraph 3(a) of the Lease, JP-Banner shall provide to Plaintiff by April 30th a statement of actual Basic Costs for the prior calendar year and refund any overpayment. JP-Banner has failed to refund any overpayment to Plaintiff and has failed to provide a statement of actual Basic Costs for 2020 and 2021.

177.    Eighth, pursuant to paragraph 3(d) of the Lease, if Plaintiff's final audit of any year's statement of basic costs reveals an overstatement of greater than 5%, JP-Banner must pay Plaintiff's reasonable audit and inspection fees within thirty days of receiving the invoices. Plaintiff provided invoices for both its audit of the 2017 and 2018 OPEX Report and its audit of the 2019 OPEX Report each of which revealed a greater than 5% overstatement of basic costs. Despite receiving the invoices over thirty days ago, JP-Banner has failed to reimburse Plaintiff for the cost of either Audit.

178.    As a direct and proximate result of Defendant JP-Banner's material breaches of the lease, Plaintiff has been proximately damaged.

179.    Plaintiff is entitled to recovery of its attorney's fees pursuant to paragraph 40(b) of the Lease and under Texas law.

## EIGHTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### (Against Jordan, Florsheim, Hall, Maczka, JP-Banner, Sooner, JP Banner GP, JP Realty Partners, and Banner Investors)

180.    Plaintiff incorporates, adopts, and realleges the allegations in each of the paragraphs above, as if fully set forth herein.

181.    Plaintiff conferred a benefit upon Defendants by paying for annual operating expenses of the building, rent, and grossed up charges that were fraudulently inflated, excessive, or fictitious. Defendants voluntarily accepted and retained the benefits of those payments in furtherance of the Sooner Enterprise.

182.     Because Defendants fraudulently induced Plaintiff to pay for false and fraudulent operating expenses in furtherance of the Sooner Enterprise, it would be inequitable to allow Defendants to retain the benefit of the money it was paid and/or fraudulently withheld.

183.     As a direct and proximate result of the above-described conduct of Defendants, Plaintiff has been damaged, and Defendants have been unjustly enriched.

**NINTH CLAIM FOR RELIEF**
**CONVERSION**
**(Against Jordan, Florsheim, Hall, Maczka, JP-Banner, Sooner, JP Banner GP, JP Realty Partners, and Banner Investors)**

184.     Plaintiff incorporates all of the allegations in each of the paragraphs above, as if fully set forth herein.

185.     As fully set-forth above, JP-Banner and Sooner conspired with the other Defendants to bilk Plaintiff out of excess operational costs by charging Plaintiff for inflated, excessive, or fictitious operating costs thereby wrongfully exercised dominion over the personal property of Plaintiff, which has caused damages to Plaintiff and, to date, JP-Banner and Sooner have refused Plaintiff's requests, and none of the Defendants (including JP-Banner and Sooner) have returned the misappropriated funds.

186.     As a direct and proximate result of such conduct, Plaintiff has suffered injury and seeks relief including, but not limited to, damages in an amount to be determined at trial.

**VII.     PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows and in an amount of more than $1,000,000:

1.     Damages associated with breach of the Lease Agreement in an amount to be proven at trial;

2.     Termination of the Lease Agreement due to Defendants' material breach;

57

3.      Damages associated with Defendants' Fraud and/or Fraudulent Inducement in an
        amount to be proven at trial;

4.      Damages associated with Defendants' violations of 18 U.S.C § 1962(c) in an
        amount to be proven at trial;

5.      Treble damages resulting from Defendants' violations of 18 U.S.C § 1962(c);

6.      Punitive damages in an amount to be proven at trial;

7.      Attorneys' fees and costs;

8.      Prejudgment interest;

9.      For such other and further relief as the court may deem proper.

## VIII.      JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 36(b), Plaintiff demands a trial by jury.

Dated: July 29, 2022

Respectfully submitted,

*/s/ Jenny L. Martinez*
Jenny L. Martinez
Texas State Bar No. 24013109
jmartinez@munckwilson.com
William A. Munck
Texas State Bar No. 00786127
wmunck@munckwilson.com
Aaron B. Gottlieb
Texas State Bar No. 24069815
agottlieb@munckwilson.com
Elliott C. Riches
Texas State Bar No. 24125381
eriches@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
600 Banner Place Tower
12770 Coit Road
Dallas, Texas 75251
Telephone: 972-628-3600
Telecopier: 972-628-3616

Jenifer C. Wallis (pro hac vice forthcoming)
California Bar No. 303343
jwallis@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
1925 Century Park East, Ste 2300
Los Angeles, California 90067
Telephone: 972-628-3600
Telecopier: 972-628-3616

**COUNSEL FOR PLAINTIFF**
**MUNCK WILSON MANDALA, LLP**

936566